IN THE UNITED STATES COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

PRAIRIE PROTECTION COLORADO, a Colorado non-profit corporation,

    Plaintiff,

v.

USDA APHIS WILDLIFE SERVICES, a federal agency; and
JANET L. BUCKNALL, Deputy Administrator, USDA APHIS Wildlife Services;

    Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

### I.    INTRODUCTION

1. Plaintiff Prairie Protection Colorado ("Prairie Protection"), by and through its undersigned counsel, brings this lawsuit against Defendants U.S. Department of Agriculture Animal and Plant Health Inspection Service Wildlife Services ("Wildlife Services") and Janet L. Bucknall ("Deputy Administrator" and, together with Wildlife Services, "Defendants").

2. Wildlife Services regularly enters into agreements to control prairie dogs (a type of rodent) in urban areas located throughout Colorado. In so doing, Wildlife Services is failing to comply with the Animal Damage Control Act ("ADCA"), as amended, 7 U.S.C. §§ 8351-8354; its policy interpreting the phrase "urban rodent control", 78 Fed. Reg. 49445 (Aug. 14, 2013), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

3. More specifically, in May 2020 Wildlife Services entered into a Cooperative Service Agreement with the City of Castle Rock (the "Castle Rock Agreement") (a copy of

which is attached hereto as Exhibit 1) to kill urban prairie dogs located in Castle Rock, in October 2019 Wildlife Services entered into a Cooperative Service Agreement with Colorado Springs Utilities (the "Colorado Springs Agreement") (a copy of which is attached hereto as Exhibit 2) to kill urban prairie dogs located in Colorado Springs, and in July 2019 Wildlife Services entered into a Work and Financial Plan with U.S. Fish and Wildlife Service (the "Pueblo Agreement") (a copy of which is attached hereto as Exhibit 3) to kill urban prairie dogs located in Pueblo.  As such, despite the fact that the ADCA prevents Wildlife Services from conducting "urban rodent control," 7 U.S.C. § 8353, Wildlife Services has entered into these agreements to do just that.

4. Through this Complaint, Prairie Protection seeks a declaration that killing prairie dogs in an urban area is urban rodent control, and that Wildlife Services' authorization and implementation of the agreements to kill urban prairie dogs violates federal law and is otherwise arbitrary and capricious.  Prairie Protection additionally seeks injunctive relief to redress the injuries these violations cause, including preventing Wildlife Services from implementing the urban rodent control agreements discussed herein and from conducting further urban rodent control.  Should Prairie Protection prevail, it will seek an award of costs, attorneys' fees, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## II.     PARTIES

5. Prairie Protection is a Colorado non-profit corporation with its principal place of business located in Colorado.

6. Defendant Wildlife Services is a division of the United States Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS").  Wildlife

Services is a federal agency responsible for applying and implementing the federal laws and policies challenged in this complaint. Wildlife Services receives federal and cooperator funding to undertake its activities in Colorado, including under the urban rodent control agreements discussed herein.

7. Defendant Deputy Administrator is being sued in her official capacity as the Deputy Administrator of USDA APHIS Wildlife Services.

8. Prairie Protection, as well as its board members, staff, and supporters, advocates for prairie dogs and for the conservation and restoration of prairie ecosystems throughout Colorado. Grasslands are the most endangered ecosystem on the planet. Prairie dogs are a keystone species of the grasslands, and support upwards of 180 other species. The current prairie dog population is at less than 2% of their historical numbers. The decline in black-footed ferrets, the most critically endangered mammal in the United States, and burrowing owls, a threatened species in Colorado, is directly correlated to this decline in prairie dog population. Prairie Protection's mission is to protect prairie dogs to support thriving, contiguous, natural prairies across Colorado sufficient to allow the reintroduction and survival of charismatic species such as black-footed ferrets and burrowing owls.

9. Prairie Protection board members, staff, and supporters regularly recreate throughout Colorado, including in areas populated by prairie dogs. Prairie Protection's board members, staff, and supporters enjoy watching and studying prairie dogs and the wildlife that depends on them. These animals include black-footed ferrets, burrowing owls, foxes, bobcats, coyotes, reptiles, and birds of prey. Many birds such as mountain plovers and burrowing owls rely on prairie dog colonies for breeding, making prairie dogs an important factor in enjoying

many birds in Colorado for years to come.  Their migratory nature means that these birds can be found moving throughout Colorado at different times of the year.  Whether prairie dogs are found in urban settings or in more rural locations, their burrows and colonies provide food and support for entire ecosystems, and provide aesthetic, biological, and recreational resources for Prairie Protection's board members, staff, and supporters.

10. Prairie Protection's board members, staff, and supporters live and recreate in or near areas within the area where implementation of the urban rodent control agreements discussed herein will occur, for the purposes of hiking, observing wildlife, and other recreational and professional pursuits.  Prairie Protection's board members, staff, and supporters enjoy observing, attempting to observe, photographing, and studying wildlife, including signs of the above-mentioned species' presence in these areas.  The opportunity to possibly view wildlife or signs of wildlife in these areas is of significant interest and value to Prairie Protection's board members, staff, and supporters and increases the use and enjoyment of public lands and ecosystems in Colorado.  Prairie Protection's board members, staff, and supporters also have an interest in the health and humane treatment of animals, and work to rehabilitate injured wildlife, including wildlife that may have be harmed by implementation of the urban rodent control agreements discussed herein.  Prairie Protection's board members, staff, and supporters have engaged in these activities in the past and intend to do so again soon.

11. Prairie Protection, as well as its board members, staff, and supporters, are committed to ensuring that Wildlife Services complies with all applicable federal laws.  Wildlife Services authorization and implementation of the urban rodent control agreements discussed herein adversely impacts Prairie Protection's interests in the Colorado wildlife that Wildlife

Services could injure or kill—intentionally or unintentionally—including prairie dogs, black-footed ferrets, burrowing owls, and others. Prairie Protection also has board members, staff, and supporters who are adversely impacted by the threat that Wildlife Services poses to service and companion animals in Colorado.

12. Prairie Protection and it's board members, staff, and supporters have a procedural interest in ensuring that Wildlife Services complies with all applicable federal statutes and regulations. Prairie Protection has worked to reform Wildlife Services. Prairie Protection and it's board members, staff, and supporters have an interest in preventing Wildlife Services from using lethal and inhumane methods of wildlife damage management, and in the use of more effective and proactive non-lethal alternatives that foster communities' coexistence with wildlife. The relief requested in this litigation would further that goal.

13. The interests of Prairie Protection and its board members, staff, and supporters have been, and will continue to be, injured by Wildlife Services' implementation of the urban rodent control agreements discussed herein and by Wildlife Services' failure to comply with federal law as well as its own policies.

14. The relief Prairie Protection seeks in this Complaint would redress the injuries of Prairie Protection and it's board members, staff, and supporters. The relief Prairie Protection requests, if granted, would prevent Wildlife Services from engaging in wildlife killing under the urban rodent control agreements discussed herein. Prairie Protection's requested relief, if granted, could have a long-term impact on reducing the amount of wildlife killing conducted in Colorado, as well as the inhumane treatment of wildlife and other injuries. Prairie Protection's requested relief, if granted, would make wildlife killing more expensive for state and government

entities that contract with Wildlife Services because these entities would not be able to contract with Wildlife Services to kill wildlife on their behalf unless and until Wildlife Services complies with federal law.  For example, in one agreement that Wildlife Services entered into to kill 200 acres of prairie dogs, Wildlife Services charged $23,300 while a private contractor would have charged at least $36,000.  Indeed, for that agreement the government entity confirmed that it chose Wildlife Services because "Wildlife Services provided the best value"—*i.e.*, that it was the cheapest.  These entities would not be able to procure the services that the urban rodent control agreements discussed herein authorized at the same cost as Wildlife Services.

15. Prairie Protection's interests, and the interests of its board members, staff, and supporters, have been, are being, and will continue to be harmed by Wildlife Service's actions and inactions challenged in this Complaint unless the Court grants the requested relief.  The harm to Prairie Protection's interests, and to its board members, staff, and supporters' interests, will be redressed if this Court issues the requested relief.

### III.   JURISDICTION AND VENUE

16. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1346 (government as defendant).  The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706(2).

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the agency's violations of law occurred and continue to occur in this district, and the injuries alleged herein occurred and continues to occur in this district.  Moreover, Prairie Protection resides in this district.

## GENERAL ALLEGATIONS

18. Wildlife Services and its precursors have specialized in killing wildlife for more than 100 years and are responsible for the killing of wildlife like wolves, bears, and other animals from much of the United States, particularly in the West. Wildlife Services contracts with other federal agencies, state and local governments and agencies, and private landowners to fulfill its mission of "managing problems caused by wildlife."

19. At present, Wildlife Services kills more than one million native animals every year in the U.S. In fiscal year 2018, Wildlife Services reported that it intentionally killed 357 gray wolves, 68,186 adult coyotes (plus an unknown number of coyote pups in 361 destroyed dens), 515,915 red-winged blackbirds, 338 black bears, 375 mountain lions, 1,002 bobcats, 173 river otters (plus 537 killed "unintentionally"), 3,343 foxes (plus an unknown number of fox pups in 125 dens), and 22,521 beavers. The program also killed 17,739 prairie dogs outright, as well as an unknown number killed in more than 47,547 burrows that were destroyed or fumigated. Former employees of Wildlife Services have alleged that the agency underreports the numbers of animals it kills and, therefore, that the actual numbers of animals killed by Wildlife Services are likely greater than reported.

20. Each year Wildlife Services unintentionally kills thousands of non-target animals. These non-target animals include federally- or state-protected wildlife such as gray wolves, California condors, lynx, bobcats, and grizzly bears, as well as eagles, falcons, red-tailed hawks, great horned owls, porcupines, marmots, great blue herons, ruddy ducks, sandhill cranes, and ringtail cats. These killings undermine efforts to conserve and recover the affected species, which often need protection in part due to Wildlife Services' historic and ongoing practices.

21. The non-target animals killed by Wildlife Services also includes pets. For example, between 2000 and 2012, the M-44 devices (commonly called "cyanide bombs") used by Wildlife Services killed more than 1,100 dogs.

22. As explained below, many of the species that Wildlife Services targets play critical roles in ecosystems and their removals result in a cascade of unintended consequences. For example, declines in prairie dogs result in the loss of their trophic and ecosystem engineering effects on the prairie, with consequent declines in predators (including black-footed ferrets, foxes, badgers, bobcats, coyotes, and raptors), megaherbivore activity (including bison), invertebrate pollinators, and species that associate with the open habitats and burrows that they create (including burrowing owls, mountain plovers, pronghorn, cottontail rabbits, rodents, and many species of herpetofauna and invertebrates). In short, the removal of so many animals from the environment significantly alters native ecosystem directly, indirectly, and cumulatively.

23. When Wildlife Services "manages" or "controls" prairie dogs that typically means they kill them. Wildlife Services has relocated prairie dogs in Colorado, however, most of the methods Wildlife Services uses—including anticoagulants like Rozol or Kaput, rodenticides that are poisons, and cyanide bombs—are fundamentally nonselective, environmentally destructive, inherently inhumane, and often ineffective.

24. For example, Wildlife Services uses phosphide rodenticides to kill prairie dogs by releasing phosphine gas in their stomachs, which leads to respiratory distress, asphyxiation, gastric distention and acute abdominal pain, as well as obstructive shock. Once the phosphine gas has been produced, it causes massive cellular death. Clinical signs can be seen within minutes to hours of ingestion and can include lethargy, vomiting (with and/or without blood),

wheezy and/or rapid breathing, unsteadiness, decreased mental awareness and seizures. While the onset of clinical signs can be rapid, death can take as long as 72 hours after ingestion. There is no antidote to phosphide toxicity. When poisoned prairie dogs show up dead on the surface, any non-targeted animal who eats the prairie dog will inhale the phosphine gas that is trapped in the esophagus, stomach and internal organs and will suffer the same painful, prolonged, inhumane death. Non-targeted animals that have been harmed or killed in this manner include wild animals as well as service animals and pets. In fact, when Prairie Protection and its supporters were monitoring Wildlife Services as they poisoned prairie dogs with phosphide at Cherry Creek State Park in October 2017, they documented dead prairie dogs at the surface but Wildlife Services reported that they did not remove any prairie dog carcasses from the site. This means that wild animals must have ate the poisoned prairie dogs and been poisoned themselves, which was not tracked or reported by Wildlife Services.

25. Humans are also put at risk if they inhale phosphide, and people have been harmed by the use of phosphides. In fact, in the United States since 2010 more people have been killed by the use of phosphides that Wildlife Services will be using to kill prairie dogs than people who have died from the Sylvatic plague.

26. There are prairie dogs located in urban areas throughout Colorado, including in the areas where the urban rodent control agreements discussed herein are being implemented and/or are to be implemented.

27. A prairie dog is a rodent that is a type of ground squirrel.

28. The areas where the urban rodent control agreements discussed herein are being implemented and/or are to be implemented are urban areas.

29. Burrowing owls have been present at areas where Wildlife Services has implemented and/or intends to implement urban rodent control agreements, including nesting and raising their fledglings there. Burrowing owls are dependent upon prairie dogs because they use their burrows for nesting and roosting. Due to the mass killing of prairie dogs that has occurred in the grasslands of the United States, burrowing owls are a threatened species in Colorado. In order to protect burrowing owls, prior to any killing of prairie dogs the Colorado Division of Wildlife has a policy that a burrowing owl survey be conducted, which would take a minimum of two weeks since the three surveys are to be conducted at least a week apart.

## FIRST CLAIM FOR RELIEF
(*Ultra Vires*)

30. Plaintiff Prairie Protection hereby incorporates the allegations set forth above as if fully set forth herein.

31. No federal agency or official can take an action that exceeds the scope of their constitutional and/or statutory authority.

32. Wildlife Services lacks the authority to act unless and until Congress confers the power upon it to do so, and the ADCA does not authorize Wildlife Services to conduct urban rodent control.

33. Wildlife Services authorization and implementation of the agreements to kill urban prairie dogs – including the Castle Rock Agreement, Colorado Springs Agreement, and Pueblo Agreement – exceeds the limited power that Congress conferred upon Wildlife Services in the ADCA as amended, and is, therefore, *ultra vires*.

34. The Court has the equitable power to enjoin federal agencies and federal officials who are violating federal law.

## SECOND CLAIM FOR RELIEF
### (Arbitrary, Capricious, and/or not in Accordance with Law – APA)

35. Plaintiff Prairie Protection hereby incorporates the allegations set forth above as if fully set forth herein.

36. Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

37. The action(s), finding(s), and/or conclusion(s) by Wildlife Services with respect to the execution and implementation of agreements to kill urban prairie dogs – including the Castle Rock Agreement, Colorado Springs Agreement, and Pueblo Agreement – are arbitrary, capricious, an abuse of discretion, and/or not in accordance with law under Section 706 of the APA, which has caused or threatens serious prejudice and injury to Prairie Protection's rights and interests.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Prairie Protection Colorado prays that the Court enter judgment in its favor and against Defendants on the claim asserted herein, and that it be awarded the following relief:

(1) Declare that Wildlife Services has violated and is violating the ADCA, 7 U.S.C. § 8353, and its policy interpreting that statute, 78 Fed. Reg. 49445, by authorizing and implementing the agreements to kill urban prairie dogs;

(2) Declare that the action(s), finding(s), and/or conclusion(s) by Wildlife Services regarding the agreements to kill urban prairie dogs are arbitrary, capricious, an abuse of discretion, and/or not in accordance with law under the APA;

(3) Declare that Wildlife Services' authorization and implementation of the agreements to kill urban prairie dogs is *ultra vires*;

(4) Enter such temporary, preliminary and/or permanent injunctive relief as Prairie Protection may hereinafter request, including enjoining Wildlife Services and its agents from proceeding with implementing the Castle Rock Agreement, Colorado Springs Agreement, and Pueblo Agreement, and enjoining Wildlife Services and its agents from conducting further management of rodents (including prairie dogs) in urban areas;

(5) Award Prairie Protection its attorneys' fees and costs in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and all other applicable authorities; and

(6) Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 1st day of February, 2021.

        THE ASKMAN LAW FIRM LLC

        *s/ Michael M. Frandina*
        Michael M. Frandina
        1543 Champa St., Ste. 400
        Denver, CO  80202
        720-407-4331
        michael@askmanlaw.com

        *ATTORNEYS FOR PLAINTIFF*
        *PRAIRIE PROTECTION COLORADO*