IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 21-cv-0317-WJM-MEH

PRAIRIE PROTECTION COLORADO, a Colorado non-profit corporation, and
MICHAELA HINERMAN, an individual,

    Plaintiffs,

v.

USDA APHIS WILDLIFE SERVICES, a federal agency, and
JANET L. BUCKNALL, Deputy Administrator of USDA APHIS Wildlife Services,

    Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT UNDER RULE 12(b)(1) AND 12(b)(6)

Before the Court is Defendants' United States Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS") Wildlife Services and Janet L. Bucknall, Deputy Administrator of USDA APHIS Wildlife Services, in her official capacity (jointly, "Wildlife Services" or "Defendants") Motion to Dismiss the Second Amended Complaint Under Rule 12(b)(1) and 12(b)(6) ("Motion"). (ECF No. 31.) Plaintiffs Prairie Protection Colorado ("Prairie Protection") and Michaela Hinerman (jointly, "Plaintiffs") filed a response in opposition (ECF No. 32), to which Defendants filed a reply (ECF No. 35).

In response to the Court's November 21, 2022 Order (ECF No. 41), on November 27, 2022, the parties filed a Joint Notice (ECF No. 42) advising the Court that no developments have occurred in this case that raise new or different standing issues than the parties have already addressed in the current briefing on the Motion.

In light of the Joint Notice, the Court determines that the Motion is ripe. For the reasons explained below, the Motion is granted.

## I. BACKGROUND[1]

Plaintiff Prairie Protection Colorado is an organization that "advocates for prairie dogs and for the conservation and restoration of prairie ecosystems throughout Colorado." (¶ 9.) Plaintiff Michaela Hinerman works as a contractor for companies that provide wildlife damage management services throughout Colorado. (¶ 18.) The wildlife damage management services these companies perform occur throughout Colorado, including in urban areas where prairie dogs are located such as Denver, Castle Rock, Colorado Springs, and Pueblo. (*Id.*) Hinerman has been paid for the wildlife damage management work (including prairie dog management work) she performed for these companies, which compete with Wildlife Services for prairie dog relocation work. (*Id.*; ¶ 19.)

Defendant USDA APHIS Wildlife Services is a division of the Animal and Plant Health Inspection Service within the United States Department of Agriculture. (¶ 7.) Defendant Janet L. Bucknall is the division's deputy administrator and is sued in her official capacity. (¶ 8.)

In May 2020, Wildlife Services entered into a Cooperative Service Agreement with the City of Castle Rock (the "Castle Rock Agreement") (ECF No. 29-1) to kill urban prairie dogs located in Castle Rock; in October 2019, Wildlife Services entered into a

---

[1] The Background is drawn from the Second Amended Complaint for Declaratory and Injunctive Relief ("SAC"). (ECF No. 29.) The Court assumes the allegations contained in the SAC to be true for the purpose of deciding the Motion. *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). Citations to (¶ __), without more, are references to the SAC.

2

Cooperative Service Agreement with Colorado Springs Utilities (the "Colorado Springs Agreement") (ECF No. 29-2) to kill urban prairie dogs located in Colorado Springs; and in July 2019, Wildlife Services entered into a Work and Financial Plan with U.S. Fish and Wildlife Service (the "Pueblo Agreement") (ECF No. 29-3) to kill urban prairie dogs located in Pueblo.[2]  (ECF No. 29 ¶ 3.)

Plaintiffs allege that when Wildlife Services "manages" or "controls" prairie dogs that typically means they kill them.  (¶ 28.)  However, Plaintiffs acknowledge that Wildlife Services has also merely relocated prairie dogs in Colorado.  (*Id.*)

Plaintiffs allege that Hinerman's ability to receive income for urban prairie dog management work has been, and will continue to be, injured by Wildlife Services providing prairie dog management services in urban areas.  (¶ 19.)  They allege that the subsidies Wildlife Services receives makes it more difficult for these companies to compete.  (*Id.*)  The increased competition by Wildlife Services for urban prairie dog management services allegedly reduces the ability of the private companies Hinerman has worked for to procure that same work, which in turn reduces her ability to get paid as a contractor by those companies.  (*Id.*)

On February 1, 2021, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief.  (ECF No. 1.)  They subsequently filed an Amended Complaint (ECF No. 15) on April 28, 2021, and a SAC (ECF No. 29) on December 10, 2021, which is the operative complaint here.  Plaintiffs bring two claims against Defendants: (1) an equitable *ultra vires* claim, alleging that Wildlife Services' authorization and implementation of the agreements to kill urban prairie dogs exceeds the limited power that Congress

---

[2] The Court refers to these three agreements collectively as the "Agreements."

conferred upon it in the Animal Damage Control Act ("ADCA"), as amended, 7 U.S.C. §§ 8351–54; and (2) a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, alleging that Wildlife Services' actions with respect to the execution and implementation of agreements to kill urban prairie dogs are arbitrary and capricious under 5 U.S.C. § 706(2)(A).  (¶¶ 38–45.)

Plaintiffs seek a declaration that: Wildlife Services has violated and is violating the ADCA, 7 U.S.C. § 8353, and its policy interpreting that statute, 78 Fed. Reg. 49445, by authorizing and implementing the Agreements to kill urban prairie dogs; the action(s), finding(s), and/or conclusion(s) by Wildlife Services regarding the agreements to kill urban prairie dogs are arbitrary, capricious, an abuse of discretion, and/or not in accordance with law under the APA; and Wildlife Services' authorization and implementation of the Agreements to kill urban prairie dogs is *ultra vires*.  (ECF No. 29 at 13–14.)  Additionally, Plaintiffs seek injunctive relief enjoining Wildlife Services and its agents from proceeding with implementing the Agreements, and enjoining Wildlife Services and its agents from conducting further management of rodents (including prairie dogs) in urban areas.  (*Id.* at 14.)

## II. LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter."  Fed. R. Civ. P. 12(b)(1).  Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case.  Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint.  See *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing that federal courts are courts of limited jurisdiction and

may only exercise jurisdiction when specifically authorized to do so).  The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction.  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking."  *Id.*

B.     **Federal Rule of Civil Procedure 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk,* 493 F.3d at 1177.  In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## III. ANALYSIS

A.     **Hinerman Fails to Allege Injury in Fact**

   1.     <u>Legal Standard</u>

For a court to have subject matter jurisdiction, a plaintiff must have standing. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000).  At

its "irreducible constitutional minimum," standing has three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, a plaintiff must suffer an "injury in fact" that is concrete and particularized, and actual or imminent, not conjectural or hypothetical. *Id.* Second, the injury must be traceable to the challenged action of the defendant. *Id.* Third, it must be likely that the injury will be redressed by the relief requested. *Id.* Standing is determined as of the time the action is brought. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).

The "injury in fact" requirement is satisfied differently depending on whether the plaintiff seeks prospective or retrospective relief. *See Tandy v. City of Wichita*, 380 F.3d 1277, 1283–84 (10th Cir. 2004) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 105 (1983)). To seek prospective relief, the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future. *Id.* Past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury. *Id.* (citation omitted). However, the threatened injury must be "certainly impending" and not merely speculative. *Id.* (citation omitted). A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction. *Id.* (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). To seek retrospective relief, the plaintiff "satisfies the 'injury in fact' requirement if [it] suffered a past injury that is concrete and particularized." *Id.*

In this case, Plaintiffs only seek prospective (injunctive) relief. Where, as here, a "plaintiff is not [her]self the object of the government action or inaction [s]he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

2.     Analysis

Paragraphs 18 through 20 of the SAC allege Hinerman's alleged injury in this lawsuit:

> 18. Michaela Hinerman works as a contractor for companies that provide wildlife damage management services throughout Colorado.  The wildlife damage management services these companies perform occur throughout Colorado, including in urban areas where prairie dogs are located such as Denver, Castle Rock, Colorado Springs, and Pueblo.  Michaela Hinerman has been paid for the wildlife damage management work she performed for these companies.  The companies Michaela Hinerman contracts with compete with Wildlife Services for prairie dog relocation work.
>
> 19. The work Michaela Hinerman has done for these companies includes urban prairie dog management work.  Her ability to receive income for urban prairie dog management work has been, and will continue to be, injured by Wildlife Services providing prairie dog management services in urban areas.  The subsidies Wildlife Services receives makes it more difficult for these companies to compete.  The increased competition by Wildlife Services for urban prairie dog management services reduces the ability of the private companies she has worked for to procure that same work, which in turn reduces her ability to get paid as a contractor by those companies.
>
> 20. If Michaela Hinerman won this lawsuit, it would increase her ability to receive income for doing urban prairie dog management work.  Preventing Wildlife Services from conducting urban prairie dog management would make that work more expensive for government entities that currently contract with Wildlife Services because it would reduce competition by a taxpayer subsidized government agency.  This would increase business opportunities for private wildlife damage management companies, and would increase her ability to earn income working as a contractor for those companies.

(¶¶ 18–20.)

The Court concludes that Hinerman lacks Article III standing for both claims

7

because the injury she alleges relies on multiple layers of speculation.  The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (citation omitted).  An injury that is "contingent upon speculation or conjecture" will not suffice.  *Tandy*, 380 F.3d at 1283.

Here, as Defendants highlight, Hinerman's allegations of injury constitute mere speculation concerning the harm she may someday suffer if the following hypothetical events occur: "(i) an as-of-yet-unknown entity in Colorado seeks to manage damage caused by prairie dogs living in an urban area; (ii) Wildlife Services enters into an agreement with that entity to perform the requested prairie dog damage management work; (iii) the unidentified companies for which Hinerman has performed contract work in the past are capable of and willing to perform the requested work, and compete with Wildlife Services to win the work, but lose; and (iv) those same unidentified companies would have hired Hinerman as a contractor to help perform the requested work but for losing out on the work to Wildlife Services."  (ECF No. 31 at 8.)

This is precisely the type of "chain of possibilities" that the Supreme Court has repeatedly found does not establish a party's standing.  *Clapper*, 568 U.S. at 410 (citing *Summers*, 555 U.S. at 496; *Whitmore*, 495 U.S. at 157–60).  Plaintiffs do not allege how Wildlife Services' potential future prairie dog management work would *imminently* harm Hinerman.  (*See* ECF No. 29.)  As Defendants point out, Plaintiffs also fail to allege that Hinerman or the unidentified companies competed with Wildlife Services in the past or imminently will compete with it to perform the full range of work that a future entity

8

seeking to manage prairie dog damage may wish to hire.  (ECF No. 31 at 8.)

In their response, Plaintiffs avoid addressing the deficiencies Defendants identify concerning Hinerman's alleged injury in fact, instead arguing that Hinerman has sufficiently alleged "competitor standing."  (ECF No. 32 at 9.)  Specifically, they assert that the federal government is subsidizing Wildlife Services to provide wildlife damage management services, and this subsidy harms private competitors like the companies that Hinerman contracts with by depriving them of business they would otherwise have procured, which reduces her ability to get income for that work.  (*Id.* at 10–11 (citing ¶¶ 15–20).)

The Court does not dispute that competitor standing is a potential means by which a plaintiff might show an injury in fact.  However, as Defendants explain, "competitor standing is not separate from Article III standing—it is one avenue for a plaintiff to satisfy Article III's injury-in-fact requirement when the government takes some action that favors a plaintiff's competitors or otherwise allows for increased competition against the plaintiff."  (ECF No. 35 at 2 (citing *In Renewable Fuels Ass'n v. United States EPA*, 948 F.3d 1206, 1233 (10th Cir. 2020) (explaining that "[p]robable economic injury" can constitute an injury in fact under competitor standing and that "economic actors suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition" (citation omitted))).)  But here, Plaintiffs have not shown Hinerman's injury—even under a competitor standing theory— is anything but speculative, as explained above.  (*See* ECF No. 35 at 3 ("she fails to cite a single case where a court found that a potential contractor of an unidentified private company, whose future business opportunities hypothetically could be harmed by

market competition, established injury in fact under any theory of standing").)

Therefore, the Court dismisses both claims without prejudice with respect to Hinerman for lack of subject matter jurisdiction.

## B.  Prairie Protection Is Not Within § 8353's Zone of Interests

### 1.  Legal Standard

As this Court observed in prior litigation between Prairie Protection and Wildlife Services, the APA declares that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Prairie Prot. Colorado v. USDA APHIS Wildlife Servs.*, 2019 WL 4751785, at *1, *5 (D. Colo. Sept. 30, 2019) (quoting 5 U.S.C. § 702) ("2019 Order").  This means that "the plaintiff must establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (emphasis in original)).

> Thus, for example, the failure of an agency to comply with a statutory provision requiring "on the record" hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings; but since the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters, that company would not be "adversely affected within the meaning" of the statute.

*Id.*

This form of standing, often known as "prudential standing," does not just look at the "zone of interests" Congress intended to protect, but whether the plaintiff is "arguably within the zone of interests to be protected or regulated by the statute." *Id.*

(quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (emphasis added)). And the test

> is not meant to be especially demanding. [Courts] apply the test in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable. We do not require any indication of congressional purpose to benefit the would-be plaintiff. And we have always conspicuously included the word "arguably" in the test to indicate that the benefit of any doubt goes to the plaintiff. The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

*Id.* (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citations and certain internal quotation marks omitted)).

While acknowledging the general lenience of the prudential standing test, the Court nonetheless finds that Prairie Protection's interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* This is so for three principal reasons, explained below.

2. <u>Analysis</u>

In the SAC, Plaintiffs explain that their ultimate goal in filing this lawsuit is to obtain "a declaration that that killing prairie dogs in an urban area is urban rodent control, and that Wildlife Services' authorization and implementation of the agreements to kill urban prairie dogs exceeds its authority, violates federal law, and is otherwise arbitrary and capricious." (¶ 4). In their response brief, Plaintiffs make several arguments concerning Hinerman's zone of interests analysis, which are now moot in light of the Court's determination that Hinerman lacks standing. (ECF No. 32 at 11–13.) And they make only conclusory arguments as to why Prairie Protection's own interests

11

fall within the statute's zone of interests. Moreover, as Defendants point out, neither Hinerman nor Prairie Protection alleges a desire to compete with Wildlife Services to perform the services outlined in the Agreements, nor would such an allegation be plausible in light of the allegations in the SAC explaining that Plaintiffs are opposed to damage management methods that would involve killing prairie dogs. (ECF No. 31 at 10 (citing ¶¶ 3–4, 23–29, prayer for relief).) For the reasons that follow, Plaintiffs have failed to demonstrate that they "fall[] within the class of plaintiffs whom Congress has authorized to sue under [§ 8353]." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014).

As earlier referenced, within the last three years, the Court has considered a nearly identical case, involving the same parties except Hinerman. *See Prairie Protection Colorado v. USDA APHIS Wildlife Services, et al.*, Civil Action No. 19-cv-2537-WJM-KLM. In its 2019 Order, the Court addressed whether Prairie Protection's interests—"asking the Court to declare that Defendant is statutorily barred [by § 8353] from carrying out a contract to kill prairie dog colonies"—arguably fell within the zone of interests to be protected by § 8353. 2019 Order at *1, *5.

First, as the Court previously found, "the statute in question, 7 U.S.C. § 8353, is not a wildlife protection statute." *Id.* at *6. It is, rather, an authorization to "control"—in most cases, a euphemism for "kill"— "nuisance mammals and birds and those mammal and bird species that are reservoirs for zoonotic diseases." *Id.*

Second, as the Court previously found, "the urban rodent control exception is manifestly not intended to protect 'urban rodent[s],' whether one conceives of that phrase to mean any rodent in an urban area ([Plaintiffs'] view) or rodents that are

generally associated with urban infestations ([Defendants'] view)." *Id.* Defendants correctly emphasize in the Motion that Congress has not "ever suggested that the rats of any city warrant special protection." (ECF No. 31 at 11.) And Defendants reiterate a point the undersigned made in his 2019 Order—namely, that the statute imposes no prohibitions on any entity other than the Secretary of Agriculture, strongly indicating that the interest at stake was something other than protecting rats, mice, and other urban rodents. (*Id.* (citing 2019 Order at *6).)

Third, the statute itself and the surrounding statutory context demonstrate that "the exception was meant to avoid usurping business opportunities for private exterminators." 2019 Order at *6. As the Court has previously pointed out, a 2007 bill passed by the Senate—but ultimately not by the full Congress—included findings about the economic importance of the private pest management industry and the need for Wildlife Services to take the urban rodent control exception seriously when private exterminators could do the job. *See id.* (citing 153 Cong. Rec. S15653-03, at 2007 WL 4364201 (Dec. 14, 2007)). Additionally, Defendants issued a 2013 policy statement in the Federal Register which shed additional light on the definition of the term "rodent" and stated that there are "some categories of actions for which [Defendant] will continue to consider requests for operational assistance . . . [including] . . . government entities engaged in a cooperative service agreement with [Defendant] to provide direct control of rodents as of October 1, 2013 . . . ." 78 Fed. Reg. 49445, 49446 (Aug. 14, 2013) (some alterations in original, some added).

Given the foregoing, the undersigned concluded:

> In sum, there is no reasonable way to view § 8353 and its urban rodent control exception as even arguably bringing

> animal protection, or protection of humans from chemicals, within its zone of interests. Thus, Plaintiff lacks prudential standing, and is therefore unlikely to succeed on the merits of this lawsuit.

2019 Order at *7. Here, the Court again concludes that Prairie Protection's interest in protecting prairie dogs is unrelated to § 8353's purpose in granting Wildlife Services authority to manage damage caused by nuisance animals or in protecting the private pest control industry from federal competition. Therefore, the Court dismisses the APA claim without prejudice.

**C.    The *Ultra Vires* Claim Fails**

    1.    Legal Standard

Federal courts have authority "to enjoin unlawful executive action," apparently arising from "a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "The contours of this equitable claim are ill-defined." *Prairie Prot. Colorado v. USDA Aphis Wildlife Servs.*, 2020 WL 3469712, at *4 (D. Colo. June 25, 2020).

If an agency exceeds "its statutory bounds, judicial review remains available" to curb the rogue action. *Am. Clinical Lab'y Ass'n v. Azar*, 931 F.3d 1195, 1208 (D.C. Cir. 2019) (quoting *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018)). To challenge agency action on the ground that it is *ultra vires*, a plaintiff must show a "patent violation of agency authority." *Id.* (quoting *Indep. Cosmetic Mfrs. & Distribs., Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 574 F.2d 553, 555 (D.C. Cir. 1978)). The Supreme Court has "long required in *ultra vires* cases that the agency action go beyond mere legal or factual error and amount to a 'clear departure by the [agency] from its statutory mandate' or be 'blatantly lawless' agency action." *Fed. Express Corp. v. United States*

14

*Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (quoting *Oestereich v. Selective Serv. Sys. Loc. Board No. 11*, 393 U.S. 233, 238 (1968)).  In other words, "garden-variety errors of law or fact are not enough."  *Id.* (internal alterations and citation omitted).

"Stated simply, a claim that an agency acted *ultra vires* is a claim that the agency acted 'in excess of its delegated powers and contrary to a specific prohibition in [an] Act[,]' . . . not that an agency's authorized action was imprudent or that, in validly exercising its judgment, the agency reached the wrong result."  *Eagle Tr. Fund v. United States Postal Serv.*, 365 F. Supp. 3d 57, 67 (D.D.C. 2019), *aff'd*, 811 F. App'x 669 (D.C. Cir. 2020) (internal citation omitted) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)).  *Ultra vires* review "is intended to be of extremely limited scope," and it "represents a more difficult course . . . than would review under the APA."  *Am. Clinical Lab'y Ass'n,* 931 F.3d at 1208 (quoting *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) (internal quotations omitted)).

2. <u>Analysis</u>

Here, Plaintiffs bring a non-APA *ultra vires* claim that challenges the same conduct by Defendants that they challenge in their APA claim.  Based on Defendants' arguments and citations (ECF No. 31 at 12–14), it is not entirely clear to the Court that the zone of interests test also applies to Plaintiffs' *ultra vires* claim.  The Court notes that in response, Plaintiffs make a wholly conclusory—and therefore completely unhelpful—argument, with no citation to any authority, that the zone of interests test does not apply (ECF No. 32 at 2 ("Plaintiffs' *ultra vires* claim is not even subject to a zone of interest test.").[3]  Defendants also argue that because Congress has not

---

[3] Should this case come before the Court again on a motion to dismiss or other motion, the Court expects both parties to more fully analyze this issue and cite clear authority, if

exempted the ADCA from APA review, Plaintiffs have an avenue to challenge Wildlife Services' authority to perform under the Agreements; as such, Defendants argue that Plaintiffs' *ultra vires* claim is duplicative and also fails. (ECF No. 31 at 20.) Again, Plaintiffs utterly fail to address this critical argument. (ECF No. 32 at 14.) However, given that the Court will dismiss Plaintiffs' APA claim because their interests fall outside the relevant zone of interests test, it is unclear whether Defendants' argument still prevails.[4] Nevertheless, considering the allegations in the SAC, for the following reasons, the Court finds that Plaintiffs have not pled *ultra vires* action on the part of Wildlife Services.

In the SAC, Plaintiffs allege both that Wildlife Services acted in the absence of authority *and* that Congress conferred to Wildlife Services at least some authority to manage damage caused by certain animals. (*See* ¶ 41 "Wildlife Services authorization and implementation of the agreements to kill urban prairie dogs – including the Castle Rock Agreement, Colorado Springs Agreement, and Pueblo Agreement – exceeds the limited power that Congress conferred upon Wildlife Services in the ADCA as amended, and is, therefore, *ultra vires*.") However, despite Plaintiffs' conclusory allegation that the ADCA does not authorize Wildlife Services to conduct urban rodent control (¶ 40), the Court finds that what Plaintiffs are *really* alleging is that Wildlife Services has improperly interpreted and applied the urban rodent exception in determining that it had the authority to enter into the agreements. It cannot *also* be the case that Wildlife Services

---

available.

[4] Again, as stated above, should this case come before the Court again on a motion to dismiss or other motion, the Court expects both parties to more fully analyze this issue and cite clear authority, if available.

lacks authority altogether under the ADCA, but that its actions were merely "imprudent or that, in validly exercising its judgment, the agency reached the wrong result." *Eagle Tr. Fund*, 365 F. Supp. 3d at 67. Therefore, the Court finds that, as pled, Plaintiffs' *ultra vires* claim also fails.

### IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion to Dismiss the Second Amended Complaint Under Rule 12(b)(1) and 12(b)(6) (ECF No. 31) is GRANTED; and

2. The Second Amended Complaint for Declaratory and Injunctive Relief (ECF No. 29) is DISMISSED WITHOUT PREJUDICE.

Dated this 13th day of December, 2022.

BY THE COURT:

William J. Martinez
United States District Judge